## EDWIN S. FORD ET AL v. A. B. CULBERTSON

No. A-6313. Decided January 8, 1958.
Rehearing overruled February 5, 1958.
(308 S.W. 2d Series 855)

*Kilgore & Kilgore* and *Kiel Boone,* all of Dallas, for petitioners.

The Court of Civil Appeals erred in holding that the record in the case presents no evidence which would entitle petitioners to go to a jury upon the question of whether respondent by his conduct had waived his title requirement that the Estate's tax liability be released or satisfied, or whether respondent's conduct invoked an estoppel against his asserting a defense based upon a requirement that said tax liability be released or satisfied. Humble Oil & Refining Co. v. Harrison, 146 Texas 216, 205 S.W. 2d 355; Williams v. Beasley, 300 S.W. 193, error refused; Farmers and Mechanics Natl. Bank of Fort Worth v. Head, Texas Com. App., 7 S.W. 2d 61.

*Hudson, Keltner & Sarsgard* and *Luther Hudson,* of Fort Worth, for respondent.

Mr. Justice Smith delivered the opinion of the Court.

This suit for damages was brought by petitioners against respondent for the breach of respondent's alleged contract to purchase certain mineral royalty interests owned by the estate of Warren Wright, deceased, in the State of Mississippi. The parties will hereafter be designated as in the trial court.

The principal question presented for determination by this Court is whether the record presents evidence which would entitle plaintiffs to have submitted to a jury for its determination the question of whether the defendant by his conduct had waived his title requirement that the only substitute for a release of the estate's tax liability acceptable to him would be a certificate of solvency executed by the First National Bank of Chicago. The issue of waiver, together with fourteen others, was submitted to the jury and upon failure of the jury to reach an agreement as to this issue as well as nine others, the court discharged the jury. Thereupon, both sides filed motions for judgment, and the plaintiffs filed an alternative motion for a mistrial. The trial court overruled both of the plaintiffs' motions and granted the motion of the defendant. Judgment was rendered that plaintiffs take nothing. On appeal to the Court of Civil Appeals that court affirmed the judgment of the trial court. 300 S.W. 2d 152.

Plaintiffs present two points complaining only that the Court of Civil Appeals erred: (1) in holding that the evidence did not entitle the plaintiffs to go to the jury upon the question of waiver, and (2) that the Court of Civil Appeals erred in holding that the record presents no evidence which would entitle plaintiffs to a jury determination of the question of whether defendant's conduct invoked an estoppel against his asserting a defense based upon the requirement that the estate's tax liability be satisfied by the certificate of solvency to be executed by the Chicago bank.

Plaintiffs' argument under these points is to the effect that under the facts the respondent as a matter of law has waived or should now be estopped from asserting his dissatisfaction with the evidence of solvency of the estate of Warren Wright furnished him in lieu of and as a substitute for the certificate of solvency executed by the Chicago bank which he had originally required.

■ Plaintiffs argue in the alternative that the fact that the defendant remained silent after the substitute certificate of sol-

vency was tendered, coupled with his statement in the letter of May 22, 1952, that he was ready to close at any time, is sufficient to raise a fact issue on the question of waiver. With this latter position we agree. While we do not attempt to state below all the evidence bearing upon the issue of waiver, we are of the opinion that the record presents a fact issue as to whether the defendant intentionally waived his requirement that the plaintiffs furnished to him a certificate of solvency executed by the First National Bank of Chicago.

The record does not show the total value of the estate, but the inheritance tax was estimated to be approximately $10,000,000.00, and largely because of this tax it was deemed necessary that Mrs. Wright, Executrix of the Estate, sell some of the assets in order to pay all estate inheritance taxes, succession and similar taxes, and satisfy all liens of every character in order that all assets could be delivered to each legatee and trust free of debt as provided in the last will of Mr. Wright. The will, in addition to appointing Mrs. Wright executrix, set up four trusts (Warren Wright, Jr. Distributable Trust; Warren Wright, Jr. Income Trust; Lucille Parket Wright Trust; and Residuary Trust), as well as one contingent trust for grandchildren. The First National Bank of Chicago was named one of the trustees.

Mrs. Wright, the executrix, for the purpose of carrying out the express terms of the will of her late husband, evolved a plan to sell off various oil and gas properties. Among such properties was that designated as "Group Two Property" involved in this lawsuit. Mr. William J. Sherry was employed to prepare invitations to bid and obtain bids and in general to act as agent for the estate or the truestees or both in the sale of the properties. Invitations to bid were sent out. The invtiations to bid on the Group Two property which covered thirty or more different royalties in the State of Mississippi came to the attention of the defendant. The Baptist Foundation of Texas, with which the defendant was connected in an official capacity, received one of the bids. The defendant, after ascertaining that the Foundation was not interested in the purchase of the advertised property, and after sending Mr. James F. Gibbs, a petroleum engineer and appraiser, to Mississippi to make an investigation of the value of the properties, and after receiving a report from Mr. Gibbs placing a value of $237,000.00 on the property, did make a bid of $237,605.00 for the minerals and royalty interest set out in "Group Two." The bids were opened on January 17, 1952, and it was disclosed that defendant's bid was high. On

that same evening Mr. Sherry called the defendant, Mr. Culbertson, by long distance telephone, and informed him that he was high bidder. Apparently from the evidence, Mr. Sherry was under the impression that the bid to purchase had been made in behalf of the Baptist Foundation of Texas, but be that as it may, the record shows that prior to January 19, 1952, the date of acceptance of the bid by the trustees, Mr. Sherry was informed that the purchase was in fact to be made in the name of two daughters of defendant.

On January 19, 1952, Mr. Sherry addressed a letter to Mr. Culbertson accepting his bid on the Group 2 oil and gas royalty interests of the estate of Warren Wright, consisting of the Cranfield Area and the Heidelberg Field properties in Mississippi, being the same property involved in this suit. The letter stated that "All of the trustee have approved your bid of $237,605 with the understanding it is agreeable to have the mineral deeds and transfer orders made out, if you so request, to the Baptist Foundation of Texas. * * * Will you kindly advise me to whom you wish the conveyance made?"

On January 21, 1952, Mr. Culbertson addressed a letter to the Wright Estate replying to the above letter. The letter stated:

"I have your letter of January 19, 1952 confirming the sale to me of your Group 2 royalties in the Cranfield Area and Heidelberg Field in Mississippi.

"Please prepare the conveyances of title to the following: Marjorie Finley, wife of D. S. Finley of Tarrant County, Texas and Helen Sarsgard, wife of W. R. Sarsgard of Tarrant County, Texas, as their sole and separate property and estate.

"Please prepare transfer orders direct to the First National Bank in Dallas, as they are doing some financing through that bank and it will save two sets of transfer orders.

"I talked to Mr. Sherry on the telephone today and he stated that you would prepare the conveyance and send me the title opinions and title papers, including the form of conveyance for examination of my attorney.

"It will be necessary for me to have time to have the abstracter make a search to see that nothing has transpired affecting the title and for the trustees of the estate to give evidence of the payment of the estate and inheritance taxes, or

evidence of solvency. Just as soon as title papers can clear I am prepared to pay for the property."

On January 25, 1952, the law firm of Fellows & Fellows (attorneys for plaintiffs) gave the following reply:

"Mr. William J. Sherry has requested that I reply to your letter of January 21, 1952 addressed to the Wright estate relative to titles and the form of conveyance on the above purchase.

"It is the desire of the estate to cooperate fully in the conveyancing of the properties sold and the mode of conveying will, of course, determine the form of the conveyance. There are several possible conveyance procedures available for selection as you may already know. Mr. Wright's domiciliary estate was filed in the State of Florida and is pending. Ancillary administration proceedings have been filed in other states, including Mississippi. All ancillary probate proceedings are still pending.

"Mr. Wright died testate and his will, as admitted to probate in Florida and Mississippi, names his widow, Mrs. Lucille P. Wright, as executrix of his estate. She was appointed and has qualified as executrix in the State of Mississippi. Your attorneys will want to check these proceedings and I am today asking the attorneys for the Wright estate to forward a transcript to you. The will of Mr. Wright gives the executrix full power to convey this property and the present sale to you is in the nature of a sale under the will.

"Thus, the normal procedure would be by deed from the executrix with such confirmation in the state court as may be required. Such conveyances can be ratified and confirmed by the trustees named in the will and by Mrs. Wright individually.

"If the above mode of procedure is used and court confirmation is required some element of delay will necessarily be incurred. In addition, in many states bids may be raised on approval hearings. Thus, some bidders have indicated that they might prefer a conveyance executed by the trustees named in the will with confirmation by the executrix and beneficiaries or heirs. I am not personally familiar with the law of Mississippi, but generally title to property passes immediately upon death to the demises named in the will, subject to the right of the Probate Court and the personal representatives to administer upon the estate. Your attorneys are, of course, familiar with this theory.

"The estate will convey to you this property under either mode your attorneys prefer. To assist them, we are herewith enclosing copies of the will of Mr. Wright and copies of the title opinions and conveyances to Mr. Wright. In addition, I am enclosing a schedule of title papers contained in the files in the estate office. Please hand these to your attorneys together with the estate transcript when received for their examination. Upon advice from you or your attorneys we will request the estate to initiate proper proceedings along the lines selected.

"It is my understanding that the inheritance tax return has been filed in the State of Mississippi and the tax paid. The federal return has not yet been made. We will have no trouble furnishing you evidence of solvency, however.

"It may be that you will want your attorneys to prepare the conveyance. In any event, if there is any further information we can give you please advise. Mr. Harry Orr, member of the firm of Hopkins, Sutter, Halls, DeWolfe and Owens, 1 North LaSalle Street, Chicago, Illinois, is the attorney for the estate and either he or myself will be pleased to discuss this matter with you further or with your attorney at any time. We are also enclosing the information on reserves that you requested."

On February 8, 1952, Mr. Culbertson acknowledged receipt of the Fellows' letter of January 25th, together with the enclosures, and stated that the enclosures—"With information received from Mr. J. C. Floyd have been transmitted to Mr. E. H. Ratliff, attorney at Natchez, Mississippi, who is handling the title for me." The letter also contains a request for an extra copy of the invitation to bid "in the Group 2 covered by my purchase."

On March 4, 1952, Mr. Culbertson addressed the following letter to Fellows & Fellows:

"Gentlemen:

"I was in New Orleans last week in the office of the California Company and conferred with Mr. Waguespack. He showed me your letter explaining to him that the Baptist Foundation had purchased the Wright properties. This is incorrect as the Baptist Foundation declined to purchase the properties and I purchased them for my daughters, Marjorie Finley, wife of D. S. Finley of Tarrant County, Texas, and Helen Sarsgard, wife of W. R. Sarsgard of Tarrant County, Texas and so noti-

fied the Warren Wright estate in my letter of January 21st as well as in my conversation with Mr. Sherry.

"I have referred the matter of titles to Messrs. Wells, Wells, Newman and Thomas, Lamar Life Building, Jackson, Mississippi, since they examined the title for the California Company in the first place. I was in Natchez and conferred with Mr. E. H. Ratcliff who has been making the search of title and I hope to speed up the matter from this end of the line.

"I explained to Mr. Waguespack that I was arranging with the First National Bank of Dallas for the financing and would like to have a transfer order so that the run could be paid directly to the bank. He stated that we should have two division orders executed at the same time, one to my daughters and the other to the bank as collateral. I wish you would keep this in mind in working up the transfer orders."

On March 10, 1952, Fellows & Fellows replied to the above letter of March 4th, as follows:

"Dear Mr. Culbertson:

"I have your letter of March 4th relative to the Mississippi royalty purchase from the above estate. You had previously advised of the change of names for the grantee but I had rather assumed that the Foundation was still the ultimate purchaser.

"From your letter, I assume that you will need a transfer order from the estate of Warren Wright to your daughters, and then a second transfer from your daughters to the bank as collateral. The oil purchasers are rather uniformly stating that they will want to prepare the transfer orders, so suggest that you advise them the nature of the second transfer order.

"In this connection, the estate will likely have some runs to endorse over to the purchase or to account for, if in suspense. Should these also be paid over to the bank?

"The estate is getting anxious to close these sales and is pushing Mr. Sherry and myself. As you know, these sales were made necessary because of the federal estate tax. This tax was originally due March 20 and while a thirty day extension has been secured it will take some time to secure transfer orders and close the sales. I therefore appreciate your efforts to speed

the matter and trust that we will be able to close the sale prior to the due date of these taxes.

"I assume that the attorney for the estate, Mr. Floyd has furnished you with all the information you need."

On March 14, 1952, Mr. Culbertson addressed a letter to Fellows & Fellows, reading as follows:

"Gentlemen:

"Thank you for your letter of March 10, 1952. As I told you before, I went to Natchez and New Orleans in an effort to speed up the title search, and, as a consequence, I requested the attorneys for the California Company in Jackson, Mississippi to handle the final title matters for me because, in that way I thought we could expedite transfer orders. These attorneys handled the title of this property when it was acquired by the California Company. I have a letter from them, saying that they are proceeding with the title matters.

"I have no doubt that by the end of the month we should be in position to close if the California Company will approve the transfer orders.

"We are prepared to pay off at any time that we can get the title finally approved.

"I think the transfer orders ought to be effective April 1, 1952 as to the First National Bank and as of January 1, 1952 as to the purchasers, Mrs. Finley and Mrs. Sarsgard. This is true because the invitation for the bid provided that the purchaser would get all of the oil runs beginning with January 1, 1952. I am sending a copy of this letter to the estate of Warren Wright for its information."

On March 27, 1952, Mr. Culbertson addressed a letter to Fellows & Fellows, reading as follows:

"Gentlemen:

"I am advised by attorneys in Jackson, Mississippi that it is expected that the title will be ready by the first of April. I have asked them to prepare the conveyance in line with your suggestion and hope that we may have the papers here for execution some time during this week, although it is possible that it

might be delayed until early next week. I have the transfer orders prepared by the California Company in respect to the property in the Cranfield area and part of the Heidelberg and should have the orders in a few days. I could send it to you now already executed but thought best to hold them until I received the form conveyance and then send all the transfer orders properly executed at this end of the line along with the form of conveyance for execution.

"I wish you would give thought to the mechanics of closing the transaction. It would be satisfactory with me for you to attach the conveyance with the executed transfer order to a draft drawn on Mrs. Marjorie Finley and Mrs. Helen Sarsgard through the First National Bank of Dallas, and the draft will be paid promptly upon receipt. ·

"I was assured by you that the estate was solvent and able to meet its taxes and other obligations. Since the First National Bank of Chicago is a trustee, I will be satisfied with a letter from that bank to such effect.

"Attorneys from Jackson, Mississippi will no doubt indicate whether they will require both the executrix of the estate and the trustees to execute the convyance. I think the transfer orders should also be signed by both grantors."

On April 1, 1952, the firm of Hopkins, Sutter, Halls, DeWolfe & Owen, another firm of lawyers representing the plaintiffs, addressed a letter to Fellows & Fellows. This is the letter that the plaintiffs offered as a substitute for the certificate of solvency which was to have been executed by the First National Bank. The letter reads:

"Gentlemen:

"Reference is made to a letter dated March 27, 1952, from Mr. A. B. Culbertson relating to the sale of the Estate's oil properties in Mississippi. This will advise you that as attorneys for the Estate, we have estimated the federal estate tax liability to be approximately $7,500,000 and that amount was paid to the collector of internal revenue at Jacksonville, Florida on March 25, 1952. This will also advise you that under date of December 27, 1951, the Estate paid the sum of $2160 to the Mississippi State Tax Commissioner in payment of the estimated Mississippi inheritance tax.

"All claims against the estate, other than taxes due to other states, have been paid in full and the estate is solvent and able to meet its taxes and other obligations.

"We are writing you this letter instead of getting a letter from the First National Bank of Chicago since it is not yet acting as a trustee of the residuary trusts under the last will and testament of Warren Wright, deceased."

On April 8, 1952, Messrs. Fellows & Fellows transmitted the April 1, 1952, Hopkins et al., letter to Mr. Culbertson, and also addressed a letter to Culbertson reading as follows:

"Dear Mr. Culbertson:

"I received both of your letters relative to an early closing of the above purchase.

"Pursuant to your request, I requested from the attorneys of the Estate a letter relative to the payment of taxes. Since the First National Bank of Chicago has not yet acted as trustee as to the property of the residuary trusts, it is not qualified to know the facts as to the payment of taxes, etc. The attorneys, therefore, furnished me with their own statement, which I enclose.

"Taxes are first paid on estimates, which the government audits and then allows or makes an additional assessment. It is much like income tax. Hence, it will be six months before an actual tax lien release can be secured. However, any additional assessments would undoubtedly be small in comparison to the tax already paid and well within the reach of the estate.

"In regard to closing this sale it would appear to be more convenient to close it in the office of Mr. James Kilgore of your city. He is attorney for the estate in Texas and you are probably acquainted with him. If this is satisfactory, I shall fly to Chicago with the deed and transfer orders when received and secure the signature and execution of same and send them to Mr. Kilgore. This would appear to hasten the matter and allow you more opportunity to examine the execution. While in Chicago, I will check and ascertain the amount of runs, if any, received by the Estate since the effective date of this sale so that we can account for such runs at the same time.

"Mrs. Wright is now in Chicago taking care of some business."

On April 4, 1952, Mr. Culbertson addressed a letter to Fellows & Fellows advising that his attorneys in Mississippi were acquiring some additional title information and that they expected to have the title opinion and proposed conveyances ready by "this week," and that "You should receive it with division orders for execution, by next week. * * * Should you desire these instruments sent directly to Chicago, please let us know.

On April 21, 1952, Mr. Culbertson addressed a letter to Fellows & Fellows, reading as follows:

"Gentlemen:

"I have received letter from Wells, Thomas, Wells & Smith, as follows:

"We regret that we have not yet been able to let you have the certificate requested by you with regard to the Warren Wright royalties in Adams County. We have been having some difficulty in securing a title check on the property in Jasper County. Mr. J. M. Travis has let us have one title certificate and has promised the other to us as soon as possible. As sson as we receive this last chain of title we will be in a position to give you our certificates and the deed requested by you."

On May 22, 1952, Mr. Culbertson addressed the following letter to Fellows & Fellows:

"Gentlemen:

"We enclose herewith the following documents:

"1. Mineral right and royalty transfer to Jasper County properties in duplicate.

"2. Royalty conveyance of minerals in Adams and Franklin Counties, Mississippi, in duplicate.

"3. Transfer orders in duplicate covering the Cranfield Area.

"4. Transfer and division order of the Sun Company covering the Jasper County, Mississippi properties, in three separate sets, #4000, #4001, #4014.

"You will notice that the title opinion calls for these instru-

ments to be executed by all of the parties whose names appear in them. I think you should have the division orders signed in like manner.

"You have indicated that you would have the deal closed in local attorney's office in Dallas. I will be ready to close at any time.

"You should keep in mind the stamp tax that will have to to be paid and stamps affixed."

At some date between January 25, 1952 and May 22, 1952 the parties agreed that Mr. Culbertson should prepare the deeds and division orders mentioned in the immediately above May 22, 1952 letter, and others signed and acknowledged on June 17, 1952. All of the deeds were signed by The First National Bank of Chicago as Trustee.

On June 25, 1952, Mr. Culbertson was advised that the deeds and transfer orders had been executed.

On July 1, 1952, the transaction was to be finally closed in Dallas, Texas. Mr. Culbertson contends that there was no reason why the trade could not have been closed on July 1st, unless the plaintiffs were unable to clear the title of the tax lien or unless they were unwilling to take his alternate suggestion that they furnish an adequate certificate of solvency from the First National Bank of Chicago. The defendant further contends that he would not have been satisfied with anything less than the bank's certificate. Plaintiffs counter by contending that the defendant, in his letter of May 22, 1952, expressed his readiness to close at any time on the execution of the documents furnished and the payment of the revenue stamp tax. They contend that his silence on additional evidence of solvency in his letter of May 22, 1952 is a direct representation that the substitute certificate of solvency (letter of April 1st) was acceptable. Plaintiffs also contend that the defendant continued to remain silent until November 12, 1952, the date he notified the plaintiffs that he was no longer interested in purchasing the property.

In support of his contention that he had no intention of waiving his original requirement, the defendant points out that the substitute certificate of solvency was wholly inadequate to serve as a guaranty of solvency, and that the letter of April 1, 1952 (the substitute) contains misrepresentations in two or three particulars, either of which would render the substitute

certificate unacceptable. He further contends that the fact that he wrote the letter of May 22, 1952 enclosing the deeds and division orders and stated in the letter that he was ready to close at any time was consistent with the responsibility which he had assumed in preparing the deeds and division orders. The defendant contends that he did not waive his original requirement and at no time by his acts or conduct indicated an intention to accept the substitute certificate of solvency. He contends that he knew the bank was solvent and that its certificate of solvency could be relied upon as a guaranty that he would not be held liable for the taxes then owing in the sum of more than $500,000.00, and that in the event the estate failed to pay the taxes and discharge the lien against the property, he could look to a solvent bank for protection; that he did not know the attorneys who signed the letter of April 1, 1952. He contends that the letter was no protection to his daughters or himself in that the letter was not a direct communication to the defendant, but was a letter from one group of plaintiffs' attorneys to another and when considered in connection with the letter of April 8, 1952, amounted to no more than an effort to persuade the defendant to retreat from his original requirement. The defendant particularly points out the paragraph of the April 1, 1952 letter reading:

"All claims against the estate, other than taxes due to other states, have been paid in full, and the estate is solvent and able to meet its taxes and other obligations. We are writing you this letter instead of getting a letter from the First National Bank of Chicago, since it is not yet acting as trustee of the residuary trust under the last will and testament of Warren Wright, deceased, * * * "

as containing the inaccurate statements and misrepresentations. He contends that all claims against the estate had not been paid, because the estate had borrowed $3,000,000.00 in March 1952, and that Miss Heraty, plaintiffs' witness, had testified that this sum had not been repaid on April 1, 1952. He next contends that the evidence shows (Miss Heraty's testimony) that from May 1951 forward, the First National Bank of Chicago acted as Trustee of the Warren Wright estate, and that in June 1952, the bank signed the deeds as one of the trustees which deeds would have conveyed the property to Mr. Culbertson's daughters had the tax lien been satisfied by the alternate method required by Culbertson; that it is in evidence that all the meetings were held in the bank's building. The defendant contends that, while the marital trust provided in Mr. Wright's will and the

residuary trusts under his will were set up as of September 30, 1955, the bank continuously acted as trustee from May 1951, and not only executed the deeds to his daughters, but subsequently in 1953, executed the deeds to Humble.

In detailing the evidence and contention of the parties, we wish to make it clear that this Court does not in the least attempt to decide the factual issues between them, our sole purpose being to demonstrate that the evidence raises issues of fact, and that plaintiffs are in error in their claim that the defendant, as a matter of law, waived his requirement that the certificate of solvency be executed by the bank, and to also illustrate that the defendant is in error in his contention that the evidence shows as a matter of law that he did not waive such requirement.

■ The plaintiffs have at all times recognized that the tax lien constituted a cloud upon the Wright Estate title. The parties agree that the defendant required as a condition, precedent to acceptance of the title, that the plaintiffs furnish the defendant with a certificate of solvency to be executed by the First National Bank of Chicago, and that such certificate was to be accepted in lieu of a certificate showing full payment of the taxes and a discharge of the lien. Plaintiffs contend, however, that, although the defendant was entitled to the certificate as required, he had, as a matter of law, by his acts and conduct subsequent to making such requirement waived his request on his title objection. Plaintiffs contend that they furnished substitute evidence of solvency to which he made no objection then nor thereafter, and that by his conduct he is now estopped to assert his requirement as a defense. We cannot agree that waiver and estoppel has been shown as a matter of law. We do agree with plaintiff's alternative argument and the points therein presented that the record presents a fact issue as to whether the defendant intentionally waived his requirement that the plaintiffs furnish to him a certificate of solvency executed by the Chicago bank. We are of the opinion that the facts set out above would permit reasonable minds to differ as to the inferences to be drawn from such facts. The question of waiver is one of fact for the jury or the trier of the facts where it is a matter of inference. The plaintiffs pleaded waiver and estoppel as a defense and the burden of proof rests upon them to establish such issues by a preponderance of the evidence.

■ A waiver takes place where one dispenses with the performance of something which he has a right to exact, and occurs where one in possession of any right, whether conferred by law

or by contract, with full knowledge of the material facts, does or forbears to do something, the doing of which or the failure or forbearance to do which is inconsistent with the right or his intention to rely upon it. 92 C.J.S. 1061. Waiver, of course, is a matter or question of intention.

■ Our holding on the points presented in this Court requires a reversal of the judgments of both the trial court and the Court of Civil Appeals, unless the opinion of the latter court can be sustained on some other ground. To determine whether or not the opinion can be upheld, we are confined to a consideration of only the cross-points presented in the defendant's brief in the Court of Civil Appeals. See Vanover v. Henwood, 136 Texas 348, 150 S.W. 2d 785.

■ The defendant urged several defenses to plaintiffs' suit in the trial court. Although the judgment of that court was favorable to the defendant, the court did not sustain several of the defendant's defenses. The defendant preserved the claimed error of the trial court by presenting 19 cross-points in his brief in the Court of Civil Appeals. Some of these points, if sustained, would require a remand of the case and not a rendition. Therefore, such points will be given no consideration in this Court.

The 2nd to 9th points, both inclusive, are grouped and argued together and will be dealt with here as they were presented in the Court of Civil Appeals. These points, each in a different way and for a different reason, assert the proposition that there was no contract proven in this case sufficient to justify a judgment against the defendant for any sum of money. The points present in legal effect the contention that there was no evidence showing a contract and no evidence which would justify a judgment against the defendant. For example, the respondent's Counter Point No. 2 in the Court of Civil Appeals, if sustained, would require an affirmance of the judgment of the Court of Civil Appeals. Respondent contends that there was no contract proved in this case enforceable against A. B. Culbertson, because his bid was amended by substituting his two daughters as purchasers before there was an acceptance. This amounts to a contention that the evidence shows as a matter of law that the two daughters were substituted as purchasers before there was any acceptance. We do not agree with that contention. Therefore, the points are overruled.

■ The difendants 10th, 11th, and 12th counterpoints assert that plaintiffs cannot recover because they have not proved a

contract enforceable under the Texas Statute of Frauds. The defendant's principle contention under these points is that the bids were accepted by the trustees and not by the executrix of the estate of Warren Wright, deceased. He contends that the offer to purchase was made to the "Estate of Warren Wright," and that since there was no acceptance, either orally or in writing, by the executrix, there was no contract. We overrule this contention. We hold that an invitation to bid was made and an offer to purchase was made by the defendant, and the evidence reflects an acceptance by the executrix in her capacity as such as well as in her capacity as trustee. The defendant relies upon the case of Clegg v. Brannan, 111 Texas 367, 234 S.W. 1076, and other cases to support his contention. In the case of Adams v. Abbott, 151 Texas 601, 254 S.W. 2d 78, this Court had occasion to consider Clegg v. Brannan, supra, and in regard to that case, the Court said:

"If Clegg v. Brannan, 111 Texas 367, 234 S.W. 1076, be construed to hold that mutuality of remedy must exist at the time the contract is entered into in order for specific performance to be available against the party to be charged who has signed the contract or memorandum in writing, it could not be harmonized with the later opinions by this court and would have to yield to them as authority."

Our latest expression on the extent of the holding in the Clegg case is found in the case of Simmons & Simmons Construction Company v. Rea, 155 Texas 353, 286 S.W. 2d 415, wherein this Court said the Clegg and other cases "* * * simply announce the general rule that when a contract between two parties is reduced to writing and signed by one party and expressly accepted orally by the other, it is sufficient to impress upon it the character of a written instrument, and that a written instrument signed by one party and expressly accepted orally by the other becomes a written contract."

We overrule the defendant's further contention that there was no contract, because there was no written acceptance by the executrix. We believe the case of Adams v. Abbott, supra, supports this holding. Also, see Hoover v. Wukasch et al., 152 Texas 111, 254 S.W. 2d 507. This latter case is authority against defendant's further contention that there is no evidence of Sherry's authority to accept defendant's bid.

■ We cannot agree with the defendant's defense that the "Invitation to Bid" did not sufficiently describe and identify the

property, as well as his defense that the fact that a portion of the property was subject to the "Cranfield Unitization." The invitation to bid when considered in its entirety gives a legal transferable description of the properties involved, and identifies the Cranfield Unit by name each time a property is described that is subject thereto. Furthermore, the invitation to bid contains references to the "Royalty Owner's Unitization Agreement of January 15, 1946" each time a property is described that is affected by such agreement. The Invitation to Bid, dated December 12, 1951, gives notice by reference that the January 15, 1946 agreement was in existence. In fact, the seventeen transfer orders prepared and signed by the defendant as a witness (Mr. Culbertson witnessed the signatures of his two daughters) contain a reference to the "Royalty Owners' Unitization Agreement" identified as being dated January 15, 1946, and in each transfer reference was made to the oil and gas lease records of Adams County, Mississippi, Book 17, page 212, and to the oil and gas lease records of Franklin County, Mississippi, Book 6, page 515, for a recorded copy of such Royalty Owners' Unitization Agreement.

■ We overrule all of the defendant's defenses that the title to the properties was defective, except, of course, the question of defective title because of the tax lien which has heretofore been discussed in this opinion. Defendant's counterpoints 14 through 16 present the contention that the undisputed evidence shows that the plaintiffs failed to tender performance within a reasonable time under the circumstances and in the light of the nature of the property, and that as a consequence thereof the purchasers suffered material prejudice, and, further, that the plaintiffs cannot recover, because of their unreasonable delay in curing the defective title to the property. We overrule these points. By our holding on these points we do not mean to say that there was or was not an unreasonable delay on any of these matters. Of course, we have no way of knowing what the evidence will be upon another trial. We simply hold that the evidence introduced in the present trial does not show as a matter of law that there was an unreasonable delay in any of the particulars discussed under these points.

■ Only one other counterpoint requires consideration. Counterpoint 17 presents the contention that the plaintiffs cannot recover, because the contract upon which they based their suit was void as being in violation of The Texas Securities Act. The defendant admits that if this was a sale by Executrix of the Estate of Warren Wright, the sale was exempt under Sub-sec-

tion 3(a) of Article 600a et seq., Vernon's Annotated Civil Statutes of Texas. The defendant reasons that if the plaintiffs say this was a sale by the Executrix of the Estate of Warren Wright, then it was an exempt transaction and the Securities Act would not be applicable, but in that event he renews his argument that his offer was made to the Executrix, or the estate of Warren Wright and not the trustees. He, therefore, contends under this point that if the contract was made by the trustees, then the sale is not exempt under the Securities Act. He contends that only sales made by trustees in insolvency and bankruptcy are exempt.

We hold that this transaction is exempt under the provisions of Article 600a, Sub-section 3(a) and 3(c) et seq., supra. Warren Wright acquired practically all of the properties involved in this suit between 1944 and 1946. The sale involved in this suit, and, according to the record, all sales after his death were made principally to satisfy tax obligations. The meeting of the tax obligations was one of the necessary functions of the admiinstration of the estate by the executrix and the trustees. Since the sales were being made for the purpose of meeting the tax obligation, it makes no difference whether the sales were made by the trustees or the executrix or by both of them. There is no evidence in this record that the Estate of Warren Wright was engaged in the business of selling off its properties. The Wright Estate is not, according to this record, engaged in the business of buying and selling oil and gas properties. Under the facts, the estate is entitled to the benefit of exemptions 3(a) and 3(c), and especially under the latter.

The judgments of the trial court and the Court of Civil Appeals are both reversed and the cause is remanded to the trial court for a new trial in accordance with this opinion.

Opinion delivered January 8, 1958.

Rehearing overruled February 5, 1958.